## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BRKTHRU DIGITAL, LLC,

       Plaintiff,

v.

APIARY DIGITAL, LLC,
RED ROBIN INTERNATIONAL, INC., and
RED ROBIN GOURMET BURGERS,
INC.,

       Defendants.

_____/

RED ROBIN INTERNATIONAL, INC., and
RED ROBIN GOURMET BURGERS,
INC.,

       Counter-Plaintiffs,

v.

BRKTHRU DIGITAL, LLC,

       Counter-Defendants.

_____/

RED ROBIN INTERNATIONAL, INC., and
RED ROBIN GOURMET BURGERS, INC.,

       Cross-Plaintiffs,

v.

APIARY DIGITAL, LLC,

Case No. 2:24-cv-12770
Hon. Brandy R. McMillion
United States District Court

1

                Cross-Defendant.

_____/

APIARY DIGITAL, LLC,

                Cross-Plaintiff,

v.

RED ROBIN GOURMET BURGERS, INC.,
RED ROBIN INTERNATIONAL, INC.,

                Cross-Defendants.

_____/

## OPINION AND ORDER DENYING COUNTER-DEFENDANT BRKTHRU DIGITAL, LLC'S MOTION TO DISMISS RED ROBIN'S BREACH OF FIDUCIARY DUTY COUNTERCLAIM (ECF NO. 22)

Before the Court is Plaintiff/Counter-Defendant Brkthru Digital, LLC's ("Brkthru") Motion to Dismiss Defendants/Counter-Plaintiffs Red Robin International, Inc. and Red Robin Gourmet Burgers, Inc.'s (together, "Red Robin") Breach of Fiduciary Duty Counterclaim. ECF No. 22.[1] The Motion has been adequately briefed so the Court will rule without a hearing. *See* E.D. Mich. LR 7.1(f)(2). For the reasons that follow, the Court **DENIES** the Motion.

## I.

This case arises from the alleged failure to pay for digital media advertising services. Red Robin is a national restaurant chain focused on casual dining. ECF

---

[1] Beyond Brkthru's claims against all Defendants, and Red Robin's counterclaims against Brkthru, this case also involves crossclaims. For simplicity's sake, the Court omits reference to the parties' cross-party designations.

No. 12, PageID.159.  Driven by competition, Red Robin expends significant time and resources on advertising and marketing.  *Id.*  It utilizes not only its own "internal marketing team," but also "outside agencies" that "oversee and implement [its] marketing and advertising strategy."  *Id.*  In July 2023, Red Robin engaged Defendant Apiary Digital, LLC ("Apiary") to provide marketing consulting services.  *Id.*  The parties entered into a "Marketing Services Agreement" (referred to as the "Apiary Agreement" or the "Apiary MSA").  *Id.*; ECF No. 12-2.

Under the Apiary MSA, Red Robin and Apiary would enter "Statements of Work" (or "SOWs") describing the specific services Apiary was to provide.  ECF No. 12, PageID.159-160.  The parties executed the first SOW at the same time as the MSA and required Apiary to provide "Paid Media Management" services to Red Robin from mid-July 2023 to mid-July 2024.  *Id.*  Chief among those services was the purchase of marketing and advertising media by Apiary on Red Robin's behalf. *Id.* at PageID.160.  In exchange, Red Robin agreed to pay Apiary $260,000 in fees. *Id.*  To Red Robin's understanding, there would be no margin or mark up on the services purchased and all fees would go directly toward purchasing media.  *Id.*

Once Red Robin and Apiary entered the MSA and first SOW, Red Robin authorized Apiary to begin purchasing media.  ECF No. 12, PageID.160.  Enter Brkthru.  *Id.* at PageID.161.  Unbeknownst to Red Robin, Apiary engaged Brkthru to purchase all of the media for Red Robin.  *Id.*  Apiary never disclosed to Red Robin

that it was not purchasing media, nor that Brkthru was the entity that would be doing so instead.  *Id.*  Red Robin says it never authorized Apiary to "essentially sub-contract its media purchasing obligations to Brkthru."  *Id.*  It therefore believed that the media purchased during this relationship was purchased by Apiary.  *Id.*  However, Brkthru, not Apiary, purchased millions in digital marketing and advertising on Red Robin's behalf.  *Id.*; *see* ECF No. 1, PageID.2.

By 2024, "Insertion Orders" (or "IOs") governed the media purchases by Apiary on Red Robin's behalf.  ECF No. 12, PageID.161.  Under what Red Robin calls the "Apiary IOs," Red Robin recognized Apiary as its agent and authorized Apiary to "initiate and administer media placements."  *Id.*; ECF No. 12-3, PageID.233.  Though the Apiary IOs provided specific details about the media Apiary could purchase for Red Robin, they also gave Apiary a "large amount of discretion about specific media buys."  ECF No. 12, PageID.161.  The IOs also included certain types of media to be purchased and information about each type, including things like geographic location (typically required to be within five miles of a Red Robin restaurant), marketing tactics and targeting details, audience, price, and budget.  *Id.* at PageID.162 & n.2.  But not all media categories in the Apiary IOs delineated the type of media Apiary had to purchase.  *Id.* at PageID.162.  For things like the "specific websites [on which] a category of media would run," the IOs left that to Apiary's discretion.  *Id.*  And because of its significant discretion under the

IOs, Apiary "assured Red Robin that it would only be purchasing premium, high-quality media on Red Robin's behalf." *Id.*

According to Red Robin, after executing the IOs with Red Robin, Apiary would execute a "nearly identical IO" with Brkthru.  ECF No. 12, PageID.162; *compare* ECF No. 1-2 *with* ECF No. 1-3.  These IOs (termed the "Brkthru IOs" by Red Robin) assigned the purchase of media for Red Robin to Brkthru instead of Apiary.  *Id.*;  ECF No. 1-3.  They also incorporated the terms of Brkthru's Master Service Agreement (the "Brkthru MSA"), which, in turn, appointed Brkthru as the agent of the advertiser, Red Robin.  ECF No. 12, PageID.163.  And, like the Apiary IOs, the Brkthru IOs outlined the type of media to be purchased and left it to Brkthru's discretion (instead of Apiary's) to choose which websites would run particular media. *Id.*

Within months of the start of the parties' relationship, Red Robin saw that despite an increase in spending for media purchases, there was no corresponding increase in its business.  ECF No. 12, PageID.164.  Red Robin brought this issue to the attention of Apiary's CEO, Tiffany Coletti Kaiser ("Kaiser").  *Id.*  According to Kaiser, an employee at Apiary who was the "point person for the Red Robin account" had made "significant errors" relating to "Red Robin's media buys" and had since been fired from Apiary.  *Id.* at PageID.163-164.  "It was clear that Apiary had breached its contractual obligations to Red Robin" and Kaiser admitted as much.

*Id.* at PageID.164.  She "apologized profusely" and suggested that Apiary would "perform[] a 'make good' for Red Robin," entailing Apiary purchasing significant amounts of media for Red Robin at no additional cost.  *Id.*

These events led the parties to a meeting in the spring of 2024.  ECF No. 12, PageID.165.  There, the parties agreed to "very clear guidelines" about the "type and quality of media" Apiary would purchase for Red Robin going forward.  *Id.*  Red Robin remained "hopeful" that Apiary would abide by its "promises to purchase only premium quality media."  *Id.*  It was also around this time that Red Robin first learned about Brkthru and its role in the media purchases.  *Id.*  Despite introducing Brkthru to Red Robin, Apiary "did not fully explain Brkthru's role"; and Red Robin believed Brkthru was a "programmatic media 'trading desk'" that "simply process[ed] orders placed by Apiary."  *Id.*  As a result, Red Robin believed not only that Apiary was purchasing all the media on its behalf but also that all the money Red Robin had paid to Apiary for "media spend" was going toward purchasing that media without markups or margins.  *Id.*

After the spring 2024 meeting, Red Robin authorized Apiary to make additional media purchases.  ECF No. 12, PageID.165.  But, Red Robin believes, this media was purchased by Brkthru, not Apiary.  *Id.*  Despite the authorization of purchases of "significant amounts of media" after the spring 2024 meeting, Red Robin "still did not see the uptick in business" that it expected.  *Id.* at PageID.166.

The stagnant revenue led Red Robin to contact Kaiser in June 2024 to ask for "specific detail" about the media being purchased.  ECF No. 12, PageID.166.  Kaiser responded with information Apiary received from Brkthru.  *Id.*  This was the first Red Robin learned that media covered by the Apiary IOs had been purchased by Brkthru, not Apiary.  *Id.*  In a follow up, Red Robin asked Kaiser to confirm that Brkthru, not Apiary, had placed media orders, which Kaiser confirmed.  *Id.*  She assured Red Robin, however, that consistent with the Red Robin-Apiary agreement, Brkthru was making no margin from the media, "*i.e.,* that every dollar that Red Robin thought was being spent on media was actually going toward[] purchasing media."  *Id.*

These revelations regarding the Apiary-Brkthru relationship concerned Red Robin enough that it hired a consultant to audit the media Brkthru had purchased between January 2024 and June 2024.  ECF No. 12, PageID.166-167.  The audit revealed that Brkthru had bought "large amounts of low-quality media" for Red Robin, with "Indiatimes.com" being the "most utilized site" by Brkthru—spending over $380,000 to advertise for Red Robin on this site alone.  *Id.* at PageID.167.  Brkthru spent another $100,000 advertising Red Robin on another website, "missyusa.com," a "Korean-language website."  *Id.*  Red Robin does not have any restaurants in either India or Korea.  *Id.*

Post-audit, Red Robin contacted Brkthru directly to ask about the media it had purchased.  ECF No. 12, PageID.167.  Brkthru refused to provide Red Robin the requested information—what media it had purchased and how much it had paid.  *Id.* at PageID.167-168.  However, Brkthru did inform Red Robin that it was "being compensated on a commission basis," and, thus, made "commissions from the media that it purchased for Red Robin."  *Id.* at PageID.168.  This was "contrary to Apiary's representations" and meant that "not all of Red Robin's media spend was going toward purchasing media."  *Id.*  But what role does the "commission-based payment structure"—that was "apparently approved by Apiary . . . without Red Robin's authorization"—play?  According to Red Robin, it "incentivized Brkthru to purchase cheaper, lower quality media" so it could "pocket the difference between what Red Robin paid Apiary for the media and the actual cost of the media," thus "lin[ing] its pockets with the margins."  *Id.*  No such "commission-based arrangement" was ever disclosed to Red Robin, nor would have it agreed to such an arrangement.  *Id.*

As of the filing of Red Robin's counterclaims, Apiary and Brkthru had refused to provide information about the type and cost of the media purchased.  ECF No. 12, PageID.169.  Though Red Robin has "paid Apiary significant amounts to purchase media," it has "not yet paid certain invoices issued by Apiary" for that same media.  *Id.*

In mid-October 2024, Brkthru sued Red Robin and Apiary.  ECF No. 1.  On November 26, 2024, Red Robin answered Brkthru's Complaint and also filed crossclaims against Apiary and counterclaims against Brkthru.   ECF No. 12. Relevant here, Red Robin raised two counterclaims against Brkthru: breach of contract and breach of fiduciary duty.  *Id.* at PageID.170-172.  On December 17, 2024, Brkthru answered Red Robin's counterclaims.  ECF No. 20.  Then, on January 27, 2025, Brkthru filed its Motion to Dismiss Red Robin's Breach of Fiduciary Duty Counterclaim Under Fed. R. Civ. P. 12(b)(6).  ECF No. 22.  That Motion is fully briefed.  *See* ECF Nos. 25, 26.  Having reviewed the parties' briefs, the Court finds oral argument unnecessary and will decide the Motion based on the record before it. *See* E.D. Mich. LR 7.1(f).

## II.

Federal Rule of Civil Procedure 12(b)(6) governs a motion to dismiss a counterclaim for failure to state a claim for which relief may be granted.  *See Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 401 (6th Cir. 2012). In reviewing a 12(b)(6) motion, the Court "accept[s] all of the [counterclaim's] factual allegations as true and determine[s] whether these facts sufficiently state a plausible claim for relief."  *Fouts v. Warren City Council*, 97 F.4th 459, 464 (6th Cir. 2024) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  The Court "must 'construe the [counterclaims] in the light most favorable to the [counter-

9

]plaintiff, accept all well-pleaded factual allegations as true, and examine whether the [counterclaim] contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Norris v. Stanley*, 73 F.4th 431, 435 (6th Cir. 2023) (citations and internal quotation marks omitted). Facial plausibility requires a plaintiff to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

Typically, courts must assess the sufficiency of the complaint "without resort to matters outside the pleadings." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (citation omitted). If such materials are considered, the court generally must treat the motion to dismiss as one for summary judgment. *Id.* (citation omitted); *see* Fed. R. Civ. P. 12(d). Yet, when reviewing a 12(b)(6), the Court can consider "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to [the] defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein," without converting the motion to dismiss to one for summary judgment. *Gavitt*, 835 F.3d at 640 (citations omitted).

## III.

Brkthru seeks dismissal of Red Robin's counterclaim for breach of fiduciary duty. But before addressing those substantive arguments, the Court must consider

several procedural issues Red Robin identifies that it says warrant the Court declining to consider the merits of Brkthru's Motion.

## A.    Procedural Issues Raised by Red Robin

Red Robin first argues that Brkthru's Motion to Dismiss is untimely because motions under Rule 12(b) must be made before pleading if a responsive pleading is allowed, and responsive pleadings to counterclaims aren't just allowed, they're required.  ECF No. 25, PageID.368.  And because Brkthru filed its motion to dismiss a month after it filed its answer to the counterclaims, the argument goes, the Motion is untimely.  *Id.*  The Court agrees that, if considered as a motion to dismiss, the Motion is untimely.  Brkthru filed its answer to the counterclaims on December 17, 2024.  ECF No. 20.  It then filed its Motion to Dismiss (under Rule 12(b)(6)) on January 27, 2025.  ECF No. 22.  That's procedurally improper because any 12(b) motion must be filed *before* an answer is filed.  *See* Fed. R. Civ. P. 12(b) (requiring motions asserting defenses under this Rule to be filed before pleading if a responsive pleading is allowed).

That the motion to dismiss is untimely doesn't end the inquiry, however. Courts routinely treat untimely motions to dismiss as motions for judgment on the pleadings.  *See, e.g., Doe v. Sentech Emp. Servs., Inc.*, 186 F. Supp. 3d 732, 736 (E.D. Mich. 2016).  Seeking to avoid that treatment, Red Robin urges the Court to not convert Brkthru's Motion to a motion for judgment on the pleadings.  ECF No.

25, PageID.368-369.  Red Robin argues that it would be "procedurally improper" to convert the Motion under Rule 12(c) because Apiary had not answered Red Robin's crossclaim and, therefore, the pleadings weren't closed when Brkthru filed its Motion.  *Id*. at PageID.369.  Brkthru asks the Court to reject Red Robin's procedural argument on two grounds: (1) the pleadings between Brkthru and Red Robin were closed and (2) Apiary was required to answer the crossclaims on December 17, 2024, but it didn't answer until January 28, 2025.  ECF No. 26, PageID.396-397.  Though untimely, the Court agrees with Brkthru that it is appropriate to still consider its Motion as one for judgment on the pleadings.

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  Relevant here, "pleadings" include the complaint, the answer, the answer to a counterclaim or crossclaim, and any reply to an answer ordered by the court. Fed. R. Civ. P. 7(a).  District courts in this Circuit and others have routinely held that the pleadings are not "closed" until all defendants have filed an answer.  *See Dunn-Mason v. JP Morgan Chase Bank Nat'l Ass'n*, No. 11-cv-13419, 2013 WL 4084676, at *4 (Aug. 13, 2013) (adopting report and recommendation collecting cases in which district courts held all defendants must have filed their answers for pleadings to be considered closed); *see also XXX Int'l Amusements, Inc. v. Gulf Coast Visuals Mgmt. Co., LLC*, No. 15-14156, 2018 WL 1570335, at *12 (E.D. Mich. Mar. 30,

2018) (citing *Dunn-Mason* favorably); *Allstate Ins. Co. v. Med. Evaluations, P.C.*, No. 13-cv-14682, 2014 WL 2559230, at *1 n.1 (E.D. Mich. June 6, 2014) (same). These holdings are consistent with Wright and Miller's guidance on the issue: "[T]he pleadings are closed upon the filing of a complaint and an answer (absent a court-ordered reply), unless a counterclaim, crossclaim, or third-party claim is interposed, in which event the filing of an answer to a counterclaim, crossclaim answer, or third-party answer normally will mark the close of the pleadings." 5C Charles Alan Wright & Arthur P. Miller, *Federal Practice and Procedure* § 1367 (3d ed.).

But a court, in its discretion, may still "consider a Rule 12(c) motion even when one of the defendants has not filed an answer." *Dunn-Mason*, 2013 WL 4084676, at *4 (citations omitted); *see, e.g., Provident Life & Casualty Ins. Co. v. Ginther*, No. 96-cv-0315E(H), 1997 WL 9779, at *1 (W.D.N.Y. Jan. 3, 1997) (ruling on merits of 12(c) motion that despite being premature at the time of filing had ripened by the time the court ruled because an answer to a counterclaim had been filed). *Moore's Federal Practice* supports a court's decision to rule on a 12(c) motion even if some pleadings remain outstanding: "Although a [Rule 12(c)] motion is typically available only when all pleadings have been served and filed, if all the pleadings for the claims or defenses to which the motion is addressed have closed, the fact that some pleadings remain for later filing does not preclude a motion for judgment on the pleadings." *Textron Sys. Corp. v. Barzan Aeronautical LLC*, No.

23-cv-02828, 2024 WL 4135425, at *8 (D. Md. Sept. 10, 2024) (quoting 2 James

Wm. Moore et al., *Moore's Federal Practice* § 12.38 (3d ed.)).

Red Robin is correct that not all of pleadings were closed before Brkthru filed

its Motion to Dismiss, now being treated as a motion for judgment on the pleadings.

Apiary's answer to Red Robin's crossclaims was still pending when Brkthru filed its

Motion.  But, as between Red Robin and Brkthru, the pleadings had closed.  *See*

*EMD Performance Materials Corp. v. Marque of Brands Americas LLC*, 578 F.

Supp. 3d 670, 679 (E.D. Pa. 2022) (agreeing with the above-quoted language from

*Moore's Federal Practice*) (citation omitted).  And its Motion focuses on only one

of Red Robin's counterclaims.  *See Textron*, No. 23-cv-02828, 2024 WL 4135425,

at *8 (concluding in a case with an outstanding answer to a counterclaim that it was

fair, i.e., non-prejudicial, to the defendant for the court to consider an untimely 12(c)

motion by the plaintiff as to the complaint because the pleadings had "closed as to

[the plaintiff's] claim—the only claim for which [the plaintiff sought] Rule 12(c)

judgment.").  Apiary, for its part, filed its answer to Red Robin's crossclaims the day

after Brkthru moved to dismiss, and, a day after that, the Court entered a stipulated

order extending Apiary's time to answer.  *See* ECF Nos. 23, 24.

The Court finds that denying Brkthru's fully briefed Motion would be

inefficient, for both the Court and the parties.  The Motion is ripe for decision, and

all that would happen if denied on timeliness grounds is a refiling of the same motion

and the same briefing (absent those procedural arguments).  And because Red Robin

wouldn't suffer any prejudice by the Court addressing the merits now as opposed to

once Brkthru refiled, the Court sees no reason to deny the Motion on timeliness

grounds.  *See NanoMech, Inc. v. Suresh*, 777 F.3d 1020, 1023 (8th Cir. 2015)

("Although NanoMech is technically correct that Rule 12(c) requires all pleadings

to be closed before a motion may be filed, NanoMech did not suffer any prejudice

as a result of the district court's decision [to address the otherwise untimely 12(c)

motion].").[2]  The Court therefore rejects Red Robin's timeliness argument.

The last procedural problem Red Robin identifies is that the Motion is

premature because the existence and scope of an agency relationship is a factual

question a jury must resolve.  That's typically true.  *See Hertz Corp. v. Volvo*

*Trucking Corp.*, 533 N.W.2d 15, 17 (Mich. Ct. App. 1995).[3]  But when the court

must construe an agency agreement—like here—the issue is one of contract

interpretation and, thus, a question of law for the court to decide.  *See Meridian Mut.*

---

[2] Denial of the Motion would arguably prejudice the parties more than addressing the merits.  If denied, re-briefing the issues and waiting for the Court to again review the parties' submissions would further delay this case.  The parties haven't yet had their Rule 26(f) discovery conference, no scheduling conference has been held, no case management order has been entered, and no discovery has been conducted.  Addressing the merits now is thus more efficient and less prejudicial than having the parties start over on the motion for judgment of the pleadings, all because Brkthru filed its Motion one day early.

[3] Red Robin states that "whether Michigan law applies to [its breach-of-fiduciary-duty] claim is an open question," noting that New York law may apply.  ECF No. 25, PageID.372 n.1.  But because Red Robin "assume[s] for purposes of th[is] Motion that Michigan law applies," the Court doesn't resolve that "open question."  *Id.*

*Ins. Co. v. Crapo*, No. 226558, 2002 WL 1065856, at *2 (Mich. Ct. App. May 28, 2002) (citing *Sands Appliance Servs., Inc. v. Wilson*, 615 N.W.2d 241, 245 (Mich. 2000)). And, regardless, the Court isn't addressing the actual existence of an agency relationship but, rather, whether Red Robin has simply alleged sufficient facts to state a plausible claim that such a relationship exists and that may eventually be submitted to a jury for determination. *See Fouts v.*, 97 F.4th at 464; *Norris*, 73 F.4th at 435.

None of these procedural issues are obstacles to the Court's review, so the Court will address the substance of Brkthru's Motion.

**B.  Brkthru's Motion**

Brkthru raises three arguments that it says warrant dismissal of Red Robin's claim for breach of fiduciary duty: (1) the economic loss doctrine bars recovery in tort when the claims sound in purely economic harms more appropriately addressed by contract law; (2) the fiduciary duty claims fail because there are no allegations of a duty outside those created by contract (*i.e.*, an argument rooted in a "separate-and-distinct" analysis); and (3) Red Robin had no knowledge of Brkthru's role for "most of their contractual relationship," therefore, Red Robin cannot claim it "relied upon an unknown entity to be its alleged fiduciary." ECF No. 22, PageID.329-330.

Brkthru first urges the Court to find that the economic loss doctrine bars Red Robin's breach-of-fiduciary-duty counterclaim. ECF No. 22, PageID.332-334; ECF

16

No. 26, PageID.395-396.  Red Robin says the economic loss doctrine doesn't apply in cases involving service contracts.  ECF No. 25, PageID.383-384.  The Court agrees with Red Robin.

Michigan courts have said time and again that the economic-loss doctrine applies only to contracts for the sale of goods.  *See 1-800 Bathtub, LLC v. ReBath, LLC*, No. 357932, 2024 WL 1689099, at *7 (Mich. Ct. App. Apr. 18, 2024) (citing *Higgins v. Lauritzen*, 530 N.W.2d 171 (Mich. Ct. App. 1995) and *Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*, 656 N.W.2d 858, 863 (Mich. Ct. App. 2002)), *appeal denied*, 11 N.W.3d 490 (Mich. 2024); *see also Cargill, Inc. v. Boag Cold Storage Warehouse, Inc.*, 71 F.3d 545, 550 (6th Cir. 1995) (Michigan courts apply the economic loss doctrine only in situations involving the sale of goods, and not with transactions in services).  This case involves a contract for digital media services.  *See* ECF No. 1, PageID.1-3, 5-6; ECF No. 12, PageID.159-171, 174-185; ECF No. 12-1.  So the economic-loss doctrine does not apply.[4]

---

[4] Relying on *Rinaldo's Const. Corp. v. Michigan Bell Tel. Co.*, 559 N.W.2d 647 (Mich. 1997), and *Scarff Bros. v. Bischer Farms, Inc.*, 546 F. Supp. 2d 473, 487 (E.D. Mich. 2008), Brkthru argues that Michigan courts have extended the economic-loss doctrine to contracts for services.  ECF No. 26, PageID.395.  However, *Rinaldo's* doesn't alter the Court's finding.  Although that case "involv[ed] contracts for services, [it] addressed whether an action in tort could be maintained where it arose out of a breach of contract."  So as the Michigan Court of Appeals found in *Fraser Engine Rebuilder, Inc. v. Lancaster*, No. 360110, 2023 WL 5281853, at *7 (Mich. Ct. App. June 8, 2023), that is not enough to support the proposition that the economic-loss doctrine applies to cases with transactions for services.  *Id.*  Brkthru's reliance on *Scarff Bros.* doesn't change things either.  There the court applied the economic-loss doctrine to bar the tort-based claims, but did so evaluating whether the harm sustained was purely economic, not by any analysis of whether the contract was for goods or services.  *Scarff Bros*, 546 F. Supp. 2d at 487.

Yet Michigan courts have applied a similar rule—the separate-and-distinct analysis—to determine if a tort claim may lie despite the existence of a contract. *See Fultz v. Union Commerce Assoc.*, 683 N.W.2d 587, 592 (Mich. 2004); *Oakmont Livonia, LLC v. Rhodium Cap. Advisors, LLC*, No. 22-cv-11128, 2024 WL 199545, at *4 n.2 (E.D. Mich. Jan. 18, 2024) ("The economic loss doctrine only applies to the sale of goods.  However, a similar rule applies here under common law.  Despite the label, Plaintiffs correctly focused on whether there was a 'separate and distinct duty apart from any contractual obligation' under the rule of *Hart* [*v. Ludwig*, 79 N.W.2d 895, 898-99 (Mich. 1956)].").  The Michigan Supreme Court's decision in *Fultz* provides helpful guidance for conducting the separate-and-distinct analysis:

> [C]ourts should analyze tort actions based on a contract and brought by a plaintiff who is not a party to that contract by using a "separate and distinct" mode of analysis.  Specifically, the threshold question is whether the defendant owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations.  If no independent duty exists, no tort action based on a contract will lie.

683 N.W.2d at 592; *see Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647, 658 (Mich. 1997) (applying separate-and-distinct analysis to case in which a party to the contract asserted a tort claim).  This test can thus be broken into two steps: (1) whether the defendant (or, here, counter-defendant) owed a duty to the plaintiff (or counter-plaintiff); and (2) if so, whether that duty is separate and distinct from the defendant or counter-defendant's contractual obligations.  *Fultz*, 683 N.W.2d at 592.  Though *Fultz* involved a negligence claim, *see id.* at 589-90, the

18

Michigan Court of Appeals has also applied the separate-and-distinct analysis to breach-of-fiduciary-duty claims, *see Engel Mgmt., Inc. v. Ford Motor Credit Co.*, No. 279868, 2009 WL 348828, at *5 (Mich. Ct. App. Feb. 12, 2009).

The first question is therefore whether Brkthru owed a duty to Red Robin. Red Robin asserts that it has sufficiently alleged that Brkthru owed it fiduciary duties separate and distinct from the contracts in this case by virtue of an agency relationship.  ECF No. 25, PageID.371.  The Court agrees.

Proving a breach of fiduciary duty under Michigan law requires showing: (1) "the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages caused by the breach of duty."  *Baltrusaitis v. UAW*, 133 F.4th 678, 692 (6th Cir. 2025) (quotation marks and citation omitted).

To start, whether Brkthru owed fiduciary duties to Red Robin depends upon Brkthru's status as Red Robin's agent.  Here, Red Robin has alleged sufficient facts establishing that Brkthru is an agent of Red Robin by virtue of Brkthru's Master Service Agreement and IOs.  Red Robin alleges that the Brkthru IOs incorporated the terms of Brkthru's MSA, which appointed Brkthru as Red Robin's agent.  ECF No. 12, PageID.163.  The MSA states that, "[o]nce executed, the IO shall authorize Brkthru Digital as an agent on behalf of Advertiser" to purchase media "on Advertiser's behalf . . . as [is] required for Brkthru Digital to perform the services contemplated by this Agreement . . . ."  ECF No. 1-8, PageID.84.  Red Robin points

out that the IOs identify it as the "Client."  ECF No. 1-3, PageID.34.  The IOs also identify Apiary as the "Agency."  *Id.*  And, Red Robin further notes, the Brkthru MSA defines "Client" to mean either the "Advertiser" (Red Robin) or the "Agency representing the Advertiser" (Apiary).  ECF No. 1-8, PageID.83.  The Court agrees that Red Robin has therefore alleged sufficient facts to state a plausible claim that, when read together, the MSA and IOs establish Brkthru as an agent of Red Robin. *See Stratton-Cheeseman Mgmt. Co. v. Dep't of Treasury*, 407 N.W.2d 398, 401 (Mich. Ct. App. 1987) (recognizing that "[a]n agency relationship can be established by contract") (citing *Ayer v. Devlin*, 146 N.W. 257 (Mich. 1914)).

Red Robin has also alleged sufficient facts allowing the Court to infer that Brkthru is Red Robin's agent by law.  There's no dispute, at least for purposes of this Motion, that Apiary is Red Robin's agent.  *See* ECF No. 12, PageID.159-161 (alleging that Red Robin appointed Apiary as its agent to purchase media from third parties on Red Robin's behalf); ECF No. 1, PageID.2 (alleging that Apiary "consistently represented to Brkthru that it was acting as an agent for Red Robin). By then employing Brkthru to perform the work it was supposed to—purchasing digital media services—Apiary created an agency relationship between Red Robin and Brkthru.  "A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal."  *See*

Restatement (Third) of Agency § 3.15(1) (2006).   "The relationships between a subagent and the appointing agent and between the subagent and the appointing agent's principal are relationships of agency as stated in § 1.01."   *Id.*; *see also C.S. McCrossan Inc. v. Fed. Ins. Co.*, 932 F.3d 1142, 1146 (8th Cir. 2019) ("If an agent employs a subagent for his principal, by authority of the principal, express or implied, the subagent is the agent of the principal.") (citation omitted).[5]

The record supports the same finding.  *See* ECF No. 1, PageID.6 (alleging that "Red Robin had vested Apiary with actual authority to enter into such agreements pursuant to their contract"); ECF No. 12, PageID.161-162 (alleging that Apiary delegated its obligation to purchase digital media for Red Robin to Brkthru); ECF No. 22, PageID.326-327 (summarizing counterclaim allegations regarding agency relationship between Red Robin and Apiary).   So even if there's no agency relationship between Brkthru and Red Robin by contract, that relationship exists— on the facts alleged—by operation of law.

Resisting the imposition of this agency relationship that results in fiduciary duties, Brkthru says that Red Robin's "repeated[]" allegations that it "did not know of Brkthru's involvement" preclude finding that a fiduciary relationship exists

---

[5] The Court notes that the parties dispute whether Apiary had the authority to subcontract its media purchasing obligations to Brkthru.  *Compare* ECF No. 1, PageID.6 *with* ECF No. 12, PageID.162. However, at this stage of the litigation, the Court accepts Red Robin's allegations as true and determines if there are sufficient facts alleging the existence of an agency relationship for purposes of the present Motion.  The existence and the scope of that relationship will ultimately be up to the jury to decide.

between the two.  ECF No. 22, PageID.336 (citing ECF No. 12, PageID.165-166).

But as explained, Red Robin has alleged sufficient facts to establish that Brkthru was

its subagent.  Subagents have two principals, "the appointing agent and that agent's

principal."  Restatement (Third) of Agency, § 3.15 cmt. a (2006).  And although the

appointing agent (here, Apiary) has the "right and duty to control" the subagent

(Brkthru), the "interests and instructions of the appointing agent's principal" (Red

Robin) are "paramount."  *Id.* (citing cmt. d).  Brkthru was aware of Red Robin's

status as the advertising client.  *See* ECF No. 1-3, PageID.34.  And thus, Brkthru still

owed duties to Red Robin as a subagent—whether Red Robin knew of Brkthru or

not.

Having determined that Red Robin has stated enough facts to establish that

Brkthru owed it certain duties as its agent, the Court must next consider if those

duties are separate and distinct from Brkthru's contractual obligations.  The Court

finds that they are.  Agents are fiduciaries that owe their principals not only a duty

of good faith and loyalty, but also a "duty to use care, skill, and diligence, and to

obey the instructions of [their] principal."  *Burton v. Burton*, 51 N.W.2d 297, 303

(Mich. 1952) (quotation marks and citation omitted); *see Nedschroef Detroit Corp.*

*v. Bemas Enter. LLC*, 106 F. Supp. 3d 874, 882 (E.D. Mich. 2015).  Fiduciaries have

other duties, too: a "duty to act for the benefit of the other with regard to matters

within the scope of the relation," *Treadt v. Lutheran Church Missouri Synod*, 603

N.W.2d 816, 823 (Mich. Ct. App. 1999); *Baltrusaitis*, 133 F.4th at 692; a duty to "make a full and fair disclosure to [the principal] of all the material facts and circumstances in relation to [a] transaction," *Horvath v. Langel*, 267 N.W. 865, 867 (Mich. 1936); and a duty to provide the principal with "information," Restatement (Third) of Agency, § 8.11.  If an agent breaches those fiduciary duties, the principal may obtain damages for that breach "when a position of influence has been acquired and abused, or when confidence has been reposed and betrayed."  *In re Duane v. Baldwin Trust*, 733 N.W.2d 419, 427 (Mich. Ct. App. 2007) (quotation marks and citation omitted); *Baltrusaitis*, 133 F.4th at 692.

Here, the purchase of digital media was within the scope of the agency relationship between Red Robin and Brkthru, so Brkthru had a duty to act for Red Robin's benefit when purchasing media.  Though purchasing media itself was a contractual obligation, the Court finds that Brkthru's fiduciary duty to act for Red Robin's benefit when purchasing it is a duty separate and distinct from that contractual obligation.  And Red Robin has alleged sufficient facts to establish Brkthru had a duty to act for Red Robin's benefit when purchasing media and, thus, to not "intentionally purchase low-quality media" so it could profit from the margins

and at Red Robin's expense; and to provide information and material facts relating to the purchase of that media.[6]  ECF No. 12, PageID.159-168, 171-172.

Red Robin has also alleged enough facts to state a claim that Brkthru breached these duties.  To begin, an agent is "not at liberty to deal in the business of his agency for his own benefit." *Nedschroef Detroit Corp.*, 106 F. Supp. 3d at 882-83 (quotation marks and citation omitted); *see also Midwest Healthplan, Inc. v. Nat'l Med. Health Sys., Inc.*, 413 F. Supp. 2d 823, 832 (E.D. Mich. 2005).  And here, Red Robin alleges that Brkthru breached its duty to act for Red Robin's benefit by purchasing low-quality media in markets without Red Robin restaurants so that it could "pocket the difference between what Red Robin paid Apiary for the media and the actual cost of the media."  ECF No. 12, PageID.161, 166-171 (including allegations that Brkthru exercised its discretion in bad faith by purchasing low-quality media and "pocket[ing] the margins" and incorporating these allegations into the breach-of-fiduciary-duty claim).  Those are enough facts to state a plausible claim that Brkthru breached its duty to act for Red Robin's benefit.

Red Robin also identifies the breach of another duty: Brkthru's failure to provide information about its media purchases upon request.  *See Horvath v. Langel*,

---

[6] Brkthru argues that "Red Robin's assertion that it was somehow entitled to review Brkthru's profit margin is unfounded and supported nowhere in any of the controlling agreements."  ECF No. 22, PageID.332.  The Court agrees with Red Robin that this supports its position that the "duty to provide information is entirely separate and distinct from any contractual duty."  ECF No. 25, PageID.381; *see also* ECF No. 20, PageID.303 (answering counterclaim and denying that Red Robin was entitled to "cost and compensation information" under the agreements).

267 N.W. at 867; Restatement (Third) of Agency, § 8.11. It claims that after it audited Brkthru's media purchases and requested information about the media and how much Brkthru paid, Brkthru "refused to provide the requested information." ECF No. 12, PageID.167-168. According to Red Robin, that refusal has continued to date. *See id.* at PageID.169. That, too, is sufficient to plausibly state that Brkthru breached one of its duties to Red Robin.

Lastly, Red Robin has alleged sufficient facts to establish that it was damaged by Brkthru's conduct. The "well settled and salutary principle" that an agent may not "deal in the business of his agency for his own benefit" results in another rule: "that all profits made and advantage gained by the agent in the execution of the agency belong to the principal." *Nedschroef Detroit Corp.*, 106 F. Supp. 3d at 882-83. "And it matters not whether such profit or advantage be the result of the performance or of the violation of the duty if it be the fruit of the agency." *Id.* Here, Red Robin alleges that it spent significant amounts of money just for Brkthru to purchase low-quality media that led to poor revenue and "risked reputational harm to Red Robin." *See* ECF No. 12, PageID.165-172. Beyond that, it alleges that Brkthru purchased that media with the intention to "profit[] from the margins" and "at Red Robin's expense." *Id.* at PageID.171. What's more, Red Robin alleges that the true amount of damage caused by Brkthru's breach must be "determined at trial"

(though "in no event [is it] less than $75,000").  The Court finds these allegations

sufficient to state a plausible claim for breach of fiduciary duty against Brkthru.

## IV.

Accordingly, the Court **DENIES** Plaintiff/Counter-Defendant Brkthru's

Motion to Dismiss Defendant/Counter-Plaintiff Red Robin's Breach of Fiduciary

Duty Counterclaim (ECF No. 22).

**IT IS SO ORDERED.**


Dated: July 25, 2025                        s/Brandy R. McMillion
      Detroit, Michigan                  BRANDY R. MCMILLION
                                 United States District Judge